

**NUMBER 13-18-00246-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**JOSE ALBERTO CLEMENTE GUAJARDO,**                        **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                            **Appellee.**

**On appeal from the 398th District Court
of Hidalgo County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Tijerina
Memorandum Opinion by Chief Justice Contreras**

Appellant Jose Alberto Clemente Guajardo was convicted of manslaughter and aggravated assault, second-degree felonies, and was sentenced to concurrent prison terms of twenty-five and twenty years. *See* TEX. PENAL CODE ANN. §§ 19.04, 22.02(a)(2).[1]

---

[1] The parties state in their briefs that appellant was also convicted of deadly conduct, a third-degree

On appeal, he contends: (1) the trial court erred by not allowing effective cross-examination of a witness; (2) the prosecutor committed misconduct, resulting in an unfair trial; (3) the trial court should have granted his motion for new trial; (4) the trial court erred by excluding certain punishment phase testimony; and (5) the trial court made an improper comment on the weight of the evidence. We affirm as modified.

## I. BACKGROUND

Appellant was charged with one count of murder (Count 1), one count of attempted capital murder (Count 2), and two counts of attempted murder (Counts 3 and 4), all arising from events which occurred in the early evening of September 28, 2015, in Donna, Texas. Trial testimony established that, on that date, gunshots were fired from a silver Ford Focus into a gray Ford Mustang on westbound Expressway 83, resulting in the death of 18-year-old Javier Olmedo and injury to 17-year-old Juan Sanchez.

Christian Vasquez testified that he was the driver of the Mustang, and that his friends Olmedo and Sanchez were passengers. He stated that he, Sanchez, and Olmedo were affiliated with the South Side Bandidos gang and that Sanchez had previously gotten into fights with members of another gang, the Tri-City Bombers. According to Vasquez, on the day of the shooting, Olmedo asked for a ride to a cemetery in Donna to see his brother's gravesite. Vasquez picked up Olmedo and Sanchez and took them to the cemetery, where they stayed for about fifteen minutes. When they left, Vasquez intended to go home, but Sanchez told him to drive east on Lissner Avenue. Vasquez testified that this was a "[b]ad idea" because the area they were driving into was "Tri-City Bombers'

---

felony, and that he was sentenced to a prison term of fifteen years for that offense. *See* TEX. PENAL CODE ANN. § 22.05(b). However, the record does not contain a judgment of conviction as to that offense.

2

territory." He explained that the Tri-City Bombers were "[a] lot bigger" than his gang.

The group continued to drive down Lissner when they stopped at a stop sign adjacent to a basketball court, where Vasquez "saw a couple of cars." After stopping for about five seconds, they continued slowly and eventually passed the house of Rolando "Crash" Rodriguez, a Tri-City Bombers member. Vasquez said five or six people were in front of Rodriguez's house and they were all wearing red, the gang's color. He could not state whether Rodriguez was one of the people in front of the house. After passing the house, Vasquez sped up to about thirty miles per hour and they left the area. A short while later, Vasquez noticed that two cars—a Lincoln and an SUV—were following him closely. He had previously seen the SUV in front of Rodriguez's house. Vasquez knew the driver of the SUV as Justin Rojas, another Tri-City Bombers member. At this point, Vasquez thought "[s]omething's going to happen," so he tried to evade his pursuers. He took a left into a gas station, but it was closed, so he made a U-turn. As he made the U-turn, he noticed a Ford Focus had joined the pursuit. Vasquez said Rodriguez was in the passenger seat of the Focus and had "his hands . . . in the middle of his lap," which signified to Vasquez that Rodriguez had a gun.

Vasquez testified he took a left on Business 83 and continued at around fifty miles per hour. He said the Focus and the SUV were still following him, about ten or fifteen cars behind. After he turned north on Main Street, he sped up more, and the Focus continued. Vasquez was "zigzagging" between lanes and the Focus changed lanes along with him, about four cars back. He turned left onto the frontage road of Expressway 83 and increased his speed. At that point, he heard about twelve or thirteen gunshots, none of

3

which struck his vehicle.[2] He told his passengers to duck down, and they did. A few seconds later, he entered the expressway and moved into the left lane. He then heard five or six more gunshots, one of which shattered his vehicle's rear window. Sanchez exclaimed that Olmedo had been hit, and when Vasquez looked back, he saw Olmedo had suffered a gunshot wound to the head. Vasquez testified that he stopped the car on the shoulder and then proceeded to the hospital, while Sanchez called police.

Vasquez told police that Rodriguez was the shooter.[3] At trial, Vasquez reiterated that Rodriguez was the shooter, but he acknowledged that he did not actually see a gun or anyone firing a gun. Further, he could not identify the driver of the Focus. Vasquez never met appellant and did not see him on the day of the shooting.

On cross-examination, when asked why he thought the gang pursued his Mustang, Vasquez said that he later learned Sanchez and Rodriguez had been feuding because Sanchez "had said some stuff to [Rodriguez]'s sister." He therefore agreed that the shooting was about "[p]ersonal family issues" and was not gang-related. He conceded that he initially told police the shooting was gang-related, but he said that was because he did not know about the personal conflict between Sanchez and Rodriguez at that time.

Shaniqua Silva testified that she was friends with both appellant and Rodriguez. In order to contact appellant, she would typically call Rodriguez, because appellant tended not to answer his phone but "was always with" Rodriguez. Silva stated that the Ford Focus involved in the shooting was owned by her grandparents, but they regularly gave it to her

---

[2] Vasquez acknowledged telling police that he was familiar with firearms and that the gunshots sounded like they came from a nine-millimeter pistol.

[3] Pursuant to a plea agreement, Rodriguez pleaded guilty and was sentenced to thirty-five years' imprisonment for his role in the shooting.

to use. She said appellant often asked to borrow the car. Around the time of the shooting, appellant would stay at her house a few nights per week.

Silva testified that, on the day of the shooting, appellant asked to use the car to go see his sick mother in Weslaco. She gave him the keys and told him to return by 8:00 p.m. When appellant failed to return on time, Silva called appellant, but there was no answer, so she texted Rodriguez. A few hours later, appellant called her and asked her to pick up the Focus at "some trap house." She suspected "something happened, he did something" because he had previously always returned the car to her house. Silva's brother took her to pick up the car. She recognized the location because she had dropped appellant off there in the past. She later learned that the house belonged to Rodriguez's brother "Choco."

When Silva got into the Focus, she noticed it was almost out of fuel and so she called Rodriguez's phone and asked to talk to appellant. Rodriguez gave the phone to appellant, who told her to meet him at a friend's house nearby, so he could give her some money for gas. On her way home, she passed under the expressway and saw many law enforcement and other emergency vehicles.

A few days later, appellant called Silva and asked her to pick him up at an apartment complex in Weslaco so he could speak with her. She picked him up and he asked to go to a family member's house. According to Silva, appellant confessed to her in the car that he and Rodriguez "were the ones that were involved in" the shooting. Appellant told Silva he was driving the Focus during the shooting.[4] Silva testified she

---

[4] On cross-examination, Silva conceded that she initially told police Choco was driving her car at the time of the shooting.

asked appellant why they had to use her car, and appellant "just said he had to do it in mine. If not, he wouldn't see another day." Silva understood that to mean he would have gotten in trouble with his fellow gang members if he did not borrow the Focus. That was the last time she saw or heard from appellant.

Rodriguez testified that he "didn't feel safe to go anywhere without" appellant or Choco because "there was a whole bunch of people looking for me." On the day of the shooting, appellant came over to his house in the Focus at around 1:00 p.m. Rodriguez testified he then received several phone calls from Rojas asking for help because Sanchez, Vasquez, and Olmedo "kept passing by and threatening."[5] He told appellant about what Rojas reported, and appellant said "Well, let's go, then." According to Rodriguez, appellant said "whatever they did to me, it was to him too, because we're brothers, and no matter what he's going to be there for me, because it's like his family." Rodriguez and appellant then got into the Focus and began to "chase" the Mustang, along with Rojas in his SUV. Rodriguez said he was carrying a .40-caliber handgun while appellant was carrying a nine-millimeter. He said appellant was driving the Focus.

Rodriguez said they were going 90 to 100 miles per hour on Main Street in pursuit of the Mustang. He said he intended to "stop them and get off and beat them up and scare them, so that way they wouldn't come back." As they turned onto the expressway, Rodriguez grabbed his gun and started loading it "to get ready to start shooting at them." Rodriguez said it was appellant's idea to load the gun—according to Rodriguez, appellant "said that we might as well either scare them and get them before . . . they come back

___

[5] Rodriguez testified that "[t]hey kept threatening my sisters . . . . They would send her pictures on Facebook telling her that if they can't get me, they're going to get her, or my mom, or anybody close to me."

6

and try to get us." Rodriguez said he shot six or seven times out of the passenger window as the Mustang was entering the expressway. According to Rodriguez, appellant said "he was going to show me how to take care of business"; appellant shot six or seven times at the Mustang, which was "a little bit to the left" of the Focus; and appellant then said "I got me one" and "Let's finish them all." Rodriguez claimed that he told appellant, "Nombre, just leave it like that." They returned to Choco's house, where they removed bullet casings from the car and cleaned the car with antiseptic wipes.

The jury found appellant not guilty of attempted capital murder as alleged in Count 2. As to the other counts, the jury found appellant guilty of the lesser-included offenses of manslaughter (Count 1), aggravated assault (Count 3), and deadly conduct (Count 4).[6] After finding that appellant had been previously convicted of a felony, *see id.* § 12.42(b), the jury assessed punishment at twenty-five, twenty, and fifteen years' imprisonment for the respective offenses. Appellant filed a motion for new trial which was denied by operation of law after a hearing. *See* TEX. R. APP. P. 21.8(c). This appeal followed.

## II. DISCUSSION

### A. Cross-Examination

By his first issue, appellant argues that the trial court erred by "not allowing effective cross-examination" of Rodriguez. Appellant complains specifically that the trial court did not permit defense counsel to ask Rodriguez about whether "the shooting was

---

[6] As noted *supra* n.1, the record does not contain a judgment of conviction as to Count 4. The record instead contains a "Judgment Admitting Unadjudicated Offense and Order Barring Unadjudicated Offense" relating to Count 4. This judgment decrees that the charge of attempted murder in Count 4 "be considered as admitted an unadjudicated offense in determining sentence in [Count 1]" and "that said offense is barred from prosecution." *See* TEX. PENAL CODE ANN. § 12.45 (providing that a defendant may, with consent of the State, admit to one or more unadjudicated offenses; that those offenses may be considered by the court in determining punishment; and that prosecution will then be barred for those offenses).

7

the result of a drug deal gone bad versus the result of gang violence." Appellant argues that this ruling deprived him of his ability to present his main defensive theory—i.e., that Rodriguez harbored a personal vendetta against Sanchez, that Rodriguez was the only shooter, and that the shooting was not gang-related. *See Johnson v. State*, 433 S.W.3d 546, 551 (Tex. Crim. App. 2014) (noting that, under the Sixth Amendment, a defendant may not be prevented from "pursu[ing] his proposed line of cross examination" when it can be said that "[a] reasonable jury might have received a significantly different impression of [the witness]'s credibility had . . . counsel been permitted" to do so (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986))); *see also* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."); *Lagrone v. State*, 942 S.W.2d 602, 613 (Tex. Crim. App. 1997) (holding a trial court has the discretion to limit the scope of cross-examination "to avoid . . . harassment, prejudice, confusion of the issues, endangering the witness, and the injection of cumulative or collateral evidence").

The record reflects that, when appellant's counsel asked Rodriguez whether "cops were already looking for you" at the time of the shooting, Rodriguez replied in the affirmative and explained that the police were looking for him "for a possession of marijuana" charge. At that point, Rodriguez's attorney objected and asked for a hearing outside the presence of the jury. During that hearing, appellant's counsel explained to the court that "what we would like to get into . . . is that the cops were looking for [Rodriguez] for another shooting." Counsel stated that Rodriguez had previously "indicated to our investigator" that there was "animosity between [Rodriguez and Sanchez] because they had ripped him off of some marijuana and paid with some fake bills, and then that led to

8

a prior shooting of [Sanchez], and then that led to this." The prosecutor responded by arguing that evidence of uncharged conduct would be improper impeachment. *See* TEX. R. EVID. 609. Rodriguez's counsel concurred with the prosecutor, citing his client's right against compelled self-incrimination. The trial court then held that the proposed testimony would not be admitted, citing Texas Rule of Evidence 609. Appellant's counsel then stated, "it's not just on impeachment, it's on a prior inconsistent statement, as well." The trial court reiterated its ruling and ordered the jury to be brought back into the courtroom.

The State contends appellant failed to preserve the specific issue he now raises on appeal; i.e., that he was denied his Sixth Amendment right to effectively cross-examine Rodriguez. We agree that the issue was not preserved. At trial, defense counsel did not assert that Rodriguez's proffered testimony was admissible to fulfill appellant's right to confront witnesses under the Sixth Amendment; instead, he argued only that the testimony should be admitted as impeachment evidence and as a prior inconsistent statement. On appeal, appellant does not argue that the testimony was proper impeachment evidence under Texas Rule of Evidence 609 or that it was admissible as a prior inconsistent statement under Rule 613. Instead, he argues on appeal only that the excluded evidence "goes to the heart of the defense" and that the trial court's ruling therefore amounted to constitutional error. *See Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002).

The exact reason for the trial court's exclusion of the proposed testimony is not clear from the record. But the case law firmly establishes that, to preserve an argument that excluded testimony should have been admitted under the Confrontation Clause, a party must "clearly articulate" that rationale to the trial court. *See Reyna v. State*, 168

9

S.W.3d 173, 179 (Tex. Crim. App. 2005) (holding that, because the appellant "did not clearly articulate" that the Confrontation Clause demanded admission of certain evidence, "the trial judge never had the opportunity to rule upon" that issue and it was not preserved for appeal); *Clark v. State*, 881 S.W.2d 682, 694 (Tex. Crim. App. 1994) ("As appellant did not sufficiently clearly expressly offer the evidence for the purpose which he now claims on appeal, such is not a basis for complaint on appeal."). Appellant did not "clearly articulate" to the trial court that the testimony was admissible on the grounds he now raises on appeal. Therefore, appellant's first issue has not been preserved, and we overrule it for that reason. *See* TEX. R. APP. P. 33.1(a).

## B. Prosecutorial Misconduct

By his second issue, appellant argues the prosecutor committed misconduct. He points to at least thirteen different examples of alleged misconduct in nine separate categories.[7] Appellant sets forth the general background facts relevant to each sub-issue and summarily concludes that, when taken together, they constitute "serious and continuing prosecutorial misconduct" which "undermines the reliability of the factfinding process and deprives [him] of fundamental fairness and due process of law." Although appellant's second issue is multifarious and supported only by the barest references to authority, we will address each sub-issue—first individually, and then together—out of an abundance of caution and in our sole discretion.

Prosecutorial misconduct may require reversal where: (1) the prosecutor

---

[7] Specifically, appellant alleges the prosecutor committed misconduct by: (1) "allowing" a witness to make "false statements"; (2) failing to disclose that a witness had pending criminal charges; (3) "misus[ing]" items of evidence in order to "inflame the minds of the jury"; (4) instructing a witnesses not to speak with defense counsel; (5) referring to "overly prejudicial" "drug matters"; (6) violating a court order by "shifting the burden"; (7) violating the Rule of Witness Sequestration; (8) "asking about irrelevant matters"; and (9) withholding material from pre-trial discovery.

deliberately violated an express court order; (2) the misconduct was "so blatant as to border on being contumacious"; or (3) the prosecutor takes action that is "so clearly calculated to inflame the minds of the jury that an instruction to disregard cannot cure the harm." *See Stahl v. State*, 749 S.W.2d 826, 831 (Tex. Crim. App. 1988); *see also Greer v. Miller*, 483 U.S. 756, 765 (1987) (observing, in context of claim of improper questioning by prosecutor, that "prosecutorial misconduct may so infect the trial with unfairness as to make the resulting conviction a denial of due process"). In reviewing allegations of prosecutorial misconduct, we determine on a case-by-case basis whether the conduct requires reversal due to the probable effect on the minds of the jurors. *Stahl*, 749 S.W.2d at 830; *Hodge v. State*, 488 S.W.2d 779, 781–82 (Tex. Crim. App. 1973).

Prosecutorial misconduct is an independent basis for an objection that must be specifically urged to preserve error. *Clark v. State*, 365 S.W.3d 333, 338 (Tex. Crim. App. 2012); *Hajjar v. State*, 176 S.W.3d 554, 566 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd); *see* TEX. R. APP. P. 33.1(a). The proper method is to (1) object on specific grounds, (2) request an instruction that the jury disregard the matter improperly placed before the jury, and (3) move for a mistrial. *Penry v. State*, 903 S.W.2d 715, 764 (Tex. Crim. App. 1995); *Cook v. State*, 858 S.W.2d 467, 473 (Tex. Crim. App. 1993). That said, "[w]here there is serious and continuing prosecutorial misconduct that undermines the reliability of the factfinding process . . . resulting in deprivation of fundamental fairness and due process of law, the defendant is entitled to a new trial even though few objections have been perfected." *Bautista v. State*, 363 S.W.3d 259, 263 (Tex. App.—San Antonio 2012, no pet.) (internal quotations omitted).

11

## 1. False Testimony

The first sub-issue concerns Vasquez's trial testimony that, when meeting with prosecutors prior to trial, he did not: (1) ask for assistance in securing release on parole; (2) receive any food or gifts; or (3) talk to Sanchez on the phone. The day after Vasquez gave the subject testimony, defense counsel represented to the trial court that he spoke to Vasquez that morning, that Vasquez repudiated the subject testimony, and that Vasquez "indicated that he was instructed by the District Attorney's Office not to mention it." Vasquez was then recalled to the witness stand and testified outside the presence of the jury, contrary to his earlier testimony, that when he met with prosecutors, he asked one of them for help with parole and was given multiple meals. He denied that the prosecutor "threatened" him, but he said the prosecutor told him that "if they found out I tried to help [appellant] out, that I could get charged." He further stated that the prosecutor told him "not to tell anybody" because the prosecutor "could get into problems" for giving him "meals and phone calls." The lead prosecutor testified that he gave Vasquez food; that he informed the defense of that fact; that he told Vasquez he had no control over parole and could not promise anything with respect to parole; that he did not threaten Vasquez with additional charges; and that Vasquez made a phone call during their meeting but obeyed his instructions not to talk about the case. The prosecutor denied telling Vasquez not to discuss these facts with the jury. Appellant moved for a mistrial based on "prosecutorial misconduct" and "due process violations," and the trial court denied the motion.

The State argues appellant failed to preserve this sub-issue because defense counsel did not object until the day after Vasquez gave the allegedly false testimony. *See*

12

TEX. R. APP. P. 33.1; *Johnson v. State*, 432 S.W.3d 552, 561 (Tex. App.—Texarkana 2014, pet. ref'd) ("To preserve a prosecutorial misconduct complaint, a defendant must generally make a *timely* and specific objection, request an instruction to disregard the matter improperly placed before the jury, and move for a mistrial." (Emphasis added)).

Assuming but not deciding that the specific sub-issue was preserved, we do not find any error by the trial court in denying the mistrial. The use of material false evidence to procure a conviction violates a defendant's constitutional due process rights, regardless of whether the falsity is known to the State at the time of trial. *Ex parte De La Cruz*, 466 S.W.3d 855, 866 (Tex. Crim. App. 2015); *see* U.S. CONST. amends. V, XIV; *Napue v. Illinois*, 360 U.S. 264, 269 (1959). But to be entitled to relief on the basis of false evidence, an appellant must show by a preponderance of the evidence that (1) false evidence was presented at his trial and (2) the false evidence was material to the jury's verdict of guilt. *De La Cruz*, 466 S.W.3d at 866. Appellant has shown neither. Though Vasquez stated his original testimony regarding his meeting with prosecutors was false, the lead prosecutor provided conflicting testimony. And appellant has not argued that Vasquez's testimony, even if false, had a material effect on the jury's verdict. *See id.*; *see also* TEX. R. APP. P. 38.1(i).

### 2. Undisclosed Charges and *Brady* Material

By the second part of his second issue, appellant argues the prosecutor committed misconduct by failing to disclose that witness Jamal Silva, Shaniqua Silva's brother, had pending drug charges. By the ninth sub-issue of issue two, appellant argues the State impermissibly "withheld" the following materials from pre-trial discovery: (1) "phone/location tracking documents that defense counsel was previously told did not

13

exist" and which were produced during the testimony of a deputy United States Marshal; (2) a "Forensic Latent Print Worksheet," produced during the testimony of a forensic expert, purportedly showing latent fingerprints were obtained from the Ford Focus but excluding appellant and Rodriguez as contributors; and (3) statements made by an eyewitness to the shooting who was murdered prior to trial. Defense counsel moved for mistrial based on the failure of the State to produce these pieces of evidence in discovery, and the trial court denied the motion.

In *Brady v. Maryland*, the United States Supreme Court held that a defendant's due process rights are violated when: (1) the State fails to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to the defendant; and (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. 373 U.S. 83, 87 (1963); *see United States v. Bagley*, 473 U.S. 667, 675 (1985); *Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992); *see also* TEX. CODE CRIM. PROC. ANN. art. 39.14 (governing discovery in criminal cases). "*Brady* and its progeny do not require prosecuting authorities to disclose exculpatory information to defendants that the State does not have in its possession and that is not known to exist." *Harm v. State*, 183 S.W.3d 403, 407 (Tex. Crim. App. 2006).

Appellant's *Brady* claims each fail for various reasons. As to the pending charges against Jamal Silva, appellant has not shown that, had the existence of those charges been disclosed to defense counsel prior to trial, the outcome of the trial would have been affected. *See Brady*, 373 U.S. at 87. Jamal Silva testified at trial that he had pending charges but that the State did not threaten him or promise anything in exchange for his

14

testimony. As to the "phone/location tracking documents," appellant has not described the contents of the documents nor provided a record reference to them. He has therefore failed to establish that the documents were material or favorable to him. *See Brady*, 373 U.S. at 87; *see also* TEX. R. APP. P. 38.1(i). As to the "Forensic Latent Print Worksheet," appellant has not suggested that the State was in possession or control of that document prior to trial. Instead, the forensic expert testified that he never provided it to the District Attorney prior to his testimony. The failure of the State to produce this document in discovery cannot, therefore, form the basis of a *Brady* complaint. *See Harm*, 183 S.W.3d at 407.

Finally, as to the deceased eyewitness, appellant has not established that the evidence would have been favorable to him or would have affected the outcome of the case. *See Brady*, 373 U.S. at 87. A Donna Police Department detective testified that a "concerned citizen," whom he personally knew, contacted the department and made "very important statements regarding the actual shooting." However, appellant does not state, and the record does not reveal, the actual content of the deceased witness's statement.

### 3. "Misuse" of Exhibits

Appellant's next sub-issue contends that the State "misused" three photographic exhibits in an effort to "inflame the minds of the jury." *See Stahl*, 749 S.W.2d at 831. First, he complains that State's Exhibit 47, a photograph of appellant smoking marijuana and pointing a gun at the camera, was visible to the jurors during the trial. The record reflects that the photograph had previously been admitted into evidence, and the prosecutor denied placing the exhibit within view of the jury. The trial court denied appellant's motion for mistrial. Second, appellant makes a similar complaint regarding a "booking

15

photograph" of appellant which was allegedly visible on the prosecutor's table during trial. The prosecutor stated that she intended to introduce the photograph as evidence to show that appellant changed his appearance to avoid law enforcement. The trial court stated on the record that he could not see the photograph on the prosecutor's table and that the jurors, who were farther away, could therefore not see it either. The trial court eventually excluded the photograph from evidence on prejudice grounds. *See* TEX. R. EVID. 403. Third, appellant complains that a photograph of Olmedo, which had previously been admitted into evidence without objection, was displayed in the courtroom at times throughout the trial.

We cannot conclude that any of these incidents independently amount to misconduct warranting a mistrial or new trial. As to the photograph of appellant brandishing a gun and the photograph of Olmedo, appellant did not object to their admission into evidence or their publication to the jury. As to the booking photograph, there is nothing in the record indicating that the jury actually observed the exhibit or that it affected their evaluation of the State's case.

**4. Instructing Witness Not to Speak With Defense Counsel**

By the fourth part of his second issue, appellant argues the prosecutor committed misconduct by instructing a witness not to speak to defense counsel. The record shows that, during defense counsel's cross-examination of a Donna Police Department officer, counsel asked: "[E]arlier when I wanted to talk to you on one of the breaks, you were told not to talk to me, correct?" The trial court overruled the State's hearsay objection and the officer replied, "Correct." The prosecutor informed the trial court: "Judge, that's a misstatement. We said we couldn't talk to him." When asked on re-direct examination

16

whether the prosecutor told him "we couldn't talk to you," the officer stated he could not remember.

The officer agreed that he was instructed not to talk to defense counsel, but even assuming this testimony is true, nothing in the record indicates that this instruction came from the prosecutor or any representative of the State. Moreover, appellant cites no authority, and we find none, indicating that a prosecutor theoretically commits misconduct by directing a witness not to speak with defense counsel. Appellant has not shown prosecutorial misconduct or trial court error with regard to this sub-issue.

**5. Raising "Overly Prejudicial" and "Irrelevant" Matters**

The fifth part of appellant's second issue complains that the State failed to "redact extraneous drug matters" from a text message entered into evidence. The record shows that when the State sought to introduce text messages sent by appellant to Rodriguez as evidence, defense counsel objected on the basis of relevance, hearsay, unfair prejudice, and the right to confront witnesses. The trial court overruled the objections and admitted the evidence. Later, defense counsel informed the court that one of the messages sent by appellant contained a reference to drugs—specifically, appellant's message stated "Got bud"—and that this reference was supposed to be redacted from the exhibit. The trial court instructed the jury to disregard the reference.

The eighth part of appellant's second issue complains that the prosecutor asked a witness, Olmedo's sister-in-law, whether Olmedo's organs had been donated after his death. Defense counsel objected to the question as irrelevant; the trial court overruled the objection, and the witness replied in the affirmative. Appellant argues on appeal that "[t]his was clearly irrelevant questioning that went uncured."

17

At trial, appellant did not allege that the prosecutor committed misconduct by either failing to redact drug references from appellant's text messages or by asking a question about the donation of Olmedo's organs. On appeal, appellant does not argue that the trial court erred in overruling his evidentiary objections. Appellant has not shown prosecutorial misconduct or trial court error with regard to these sub-issues.

### 6. "Burden Shifting"

By the sixth part of his second issue, appellant contends the prosecutor committed misconduct by "shifting the burden of proof to the defense." *See Lowry v. State*, 692 S.W.2d 86, 87 (Tex. Crim. App. 1985) ("[I]t is a violation of the due process clause of the Fourteenth Amendment to shift the burden of proof in a criminal case to the defendant.").

Appellant points to an exchange that occurred during the State's direct examination of a Fort Worth Police Department detective who gave expert testimony regarding data he recovered from appellant's cell phone. At one point, the prosecutor asked the detective whether "there is data that is beyond what you—your program used, that is out there that could have been examined at [the defense's] request, but was not?" Defense counsel objected to the question on grounds that the prosecutor was "trying to shift the burden of proof to the defense." The trial court sustained the objection and instructed the jury to disregard the question. Later, the prosecutor asked whether the detective had "reinspect[ed]" appellant's phone "[a]t the request of either side." Defense counsel made the same objection as to "burden shifting," which was again sustained. The trial court then remarked: "It's been about four times—I can recall four times where they have objected to shifting the burden, and I sustained it, so just . . . be careful. . . . I mean, you are basically shifting the burden saying that their expert could have done that . . . ."

18

Appellant did not complain at trial that the prosecutor's actions constituted misconduct. He did not request a mistrial and, with the exception of the first instance, did not ask for an instruction to disregard. He has not shown any trial court error with respect to any alleged "burden shifting."

### 7. Rule of Sequestration

Finally, by the seventh part of his second issue, appellant contends the prosecutor committed misconduct by failing to instruct the witnesses about the Rule of Sequestration, which had been invoked at the beginning of trial. Appellant points to testimony by one witness, a Donna Police Department detective, stating that, during the trial, he spoke to another police witness regarding the details of the case but could not remember the prosecutor instructing him not to do so.

Under Texas Rule of Evidence 614, the trial court must, on any party's request, instruct witnesses to remain outside the courtroom so that they cannot hear other witnesses' testimony. TEX. R. EVID. 614; *see* TEX. CODE CRIM. PROC. ANN. art. 36.06; *Routier v. State*, 112 S.W.3d 554, 590 (Tex. Crim. App. 2003). The Rule is designed to prevent witnesses from altering their testimony, consciously or not, based on other witnesses' testimony. *Russell v. State*, 155 S.W.3d 176, 179 (Tex. Crim. App. 2005). To show reversible error in a violation of the Rule, an appellant must show that the violative testimony was harmful or prejudicial. *Archer v. State*, 703 S.W.2d 664, 666 (Tex. Crim. App. 1986); *see also Webb v. State*, 766 S.W.2d 236, 240 (Tex. Crim. App. 1989) (noting that harm to a defendant is shown when (1) the witness actually conferred with or heard testimony of other witnesses, and (2) the witness's testimony contradicted testimony of a witness from the opposing side or corroborated testimony of a witness with whom he or

she had conferred or heard).

Appellant does not discuss the substance of either officer's testimony and does not argue that any harmful or prejudicial testimony was admitted as a result of any violation of the Rule. Therefore, he has not shown any reversible trial court error in that regard. Further, the code of criminal procedure places the responsibility for instructing witnesses on the Rule on the trial court, not on the prosecutor or defense counsel. *See* TEX. CODE CRIM. PROC. ANN. art. 36.06 ("Witnesses, when placed under rule, shall be instructed *by the court* that they are not to converse with each other or with any other person about the case, except by permission of the court, and that they are not to read any report of or comment upon the testimony in the case while under rule." (Emphasis added)). We cannot discern any misconduct on the part of the State here, where the witness simply stated he could not recall whether the prosecutor informed him not to discuss the case with any other witnesses.

**8. Summary**

As elucidated above, appellant has not demonstrated that any single action taken by the prosecutor in this case constituted misconduct so grievous as to warrant the granting of a mistrial. Further, appellant has not demonstrated that the trial court made any legal error in relation to his allegations of misconduct.

Examining the record as a whole, we further conclude that, when taken together, the alleged instances of misconduct did not undermine the reliability of the fact-finding process and did not deprive appellant of a fundamentally fair trial. *Cf. Bautista*, 363 S.W.3d at 263. We note that, when considering whether multiple alleged trial errors cumulatively caused reversible harm, we first require the appellant to establish that error

actually occurred. *See Hughes v. State*, 24 S.W.3d 833, 844 (Tex. Crim. App. 2000). That is, non-errors may not cumulatively produce harm. *See id.* In a similar vein, though appellant has made numerous allegations of prosecutorial misconduct, none of the individual allegations have merit for the reasons set forth above. Though preservation of error is not always necessary when a prosecutor's "serious and continuing" misconduct deprives appellant of due process, *see Bautista*, 363 S.W.3d at 263, we are aware of no authority establishing that several instances of non-objectionable conduct may cumulatively render a trial unfair.

Appellant's second issue is overruled.

## C. Motion for New Trial

Appellant contends by his third issue on appeal that the trial court erred by denying his motion for new trial. We review such a decision for abuse of discretion. *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017). Specifically, appellant argues a new trial should have been ordered on the following ground presented in his new trial motion:

> The lead detective was allowed to testify, over objection, to hearsay of an alleged witness to the shooting who the detective testified was murdered shortly after the shooting in this case. Although the detective did not elaborate on her death, he implied that it was due to her being a potential witness in this case, by emphasizing that she was afraid to come forward as a witness because the shooting was allegedly gang-related. The existence of this alleged witness or the substance of her alleged testimony had not been previously disclosed to the defendant. The Court later reconsidered and struck that testimony, but denied the defense's motion for a mistrial, even though the defense argued that the jury could not be expected to ignore such highly prejudicial testimony. Furthermore, the defense later learned that the detective's testimony about the alleged witness's death was untrue or at least misleading, as the alleged witness was Maria Sandoval, who was murdered by her husband in an apparent domestic violence incident that was in no way related to the instant case. Moreover, she was killed in April 2017, almost two years after the September 2015 shooting in this case, as evidenced by the article attached as an exhibit.

21

In his argument as to this issue on appeal, appellant reproduces *verbatim* the allegation from his new trial motion and argues: "As outlined by trial counsel, this matter was clearly inflammatory and of such a nature as to suggest the impossibility of withdrawing the impression produced. A new trial is needed." Although appellant provides a record reference to the new trial motion, he does not provide record references to support the substantive allegations made in that motion. We conclude the issue has been waived as inadequately briefed. *See* Tex. R. App. P. 38.1(i).

## D. Punishment Phase Testimony

Appellant's two remaining issues concern an incident wherein the trial court sustained objections to certain testimony by appellant at the punishment stage. By his fourth issue, appellant argues the trial court erred by sustaining the State's objections. A trial court's decision on the admissibility of evidence is reviewed for abuse of discretion. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). By his fifth issue, appellant argues the trial court made an improper comment on the weight of the evidence when ruling on the objection. *See* Tex. Code Crim. Proc. Ann. art. 38.05 ("In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible; nor shall he, at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case."). "The trial court improperly comments on the weight of the evidence if it makes a statement that implies approval of the State's argument, indicates disbelief in the defense's position, or diminishes the credibility of the defense's approach to the case." *Proenza v. State*, 555 S.W.3d 389, 397 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.); *Simon v. State*,

22

203 S.W.3d 581, 590 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

The complained-of exchange began when appellant testified as follows regarding what happened on the night of the shooting:

> Started off on Lissner when I first picked him up. From Lissner, we headed towards Victoria Road. On Victoria Road I took a left, and from there I went to Old 83, and before I was getting to Old 83, that's when I asked—I had told him, Hey, what's up? Can—I need to go and put gas. And that's when he had told me to shut the fuck up and drive, and I heard a metal clicking noise, and so I—my mind just started racing. I didn't know what to really think, and I just kept doing what he was telling me. And so from Victoria Road, we got to Old 83, took a left. And they went all the way to Salinas. And he's on the phone, and—and he's just—keeps telling me, this way, this way, and I remember I was sweating, my hands were sweating, I was uncomfortable, and I just—I couldn't believe—

At that point, the prosecutor objected that appellant's testimony was "improper," and the trial court remarked:

> [Defense counsel], is—your line of questioning is basically—I'm not agreeing with your line of questioning right now, [defense counsel]. You need to rephrase it. You're basically rearguing the case all over again. The way the question is answered, you're putting on a defense in this case, so either switch your line of questioning or reask the question in a different way, [defense counsel].

Later, when defense counsel asked appellant, "why didn't you stop the shooting?", the State again objected that the question was "improper" and the trial court stated: "It's improper, [defense counsel]. This is the punishment phase, and you're going through the facts all over again. And that's a defense, so please move on."

Appellant argued in his motion for new trial and on appeal that the trial court erred by excluding this "mitigation evidence." He contends that, had appellant's testimony been admitted, "it would have provided a basis for the jury to consider in assessing a lighter sentence." He further argues on appeal that the trial court's remarks in sustaining the objections were improper because they "indicated disbelief in [appellant's] mitigation

23

evidence and diminished the credibility of the defense's approach to the case." *See Proenza v. State*, 541 S.W.3d 786, 801 (Tex. Crim. App. 2017) (holding that article 38.05 creates a "right to be tried in a proceeding devoid of improper judicial commentary" which may be expressly waived but is not forfeited by mere inaction at trial).

The State argues that the subject testimony was not actually excluded because, while the trial court sustained the objections, it did not strike the testimony from the record or instruct the jury to disregard the testimony. *See* TEX. R. APP. P. 33.1(a)(2) (providing that, to preserve an issue for appeal, a party must obtain an adverse ruling). Assuming but not deciding that appellant's evidentiary issue has been preserved for appellate review, we nevertheless conclude no abuse of discretion has been shown.

The punishment phase of the trial is directed to the defendant's prior criminal record, his reputation and character, and evidence tending to mitigate punishment. *Thomas v. State*, 750 S.W.2d 234, 235 (Tex. App.—Dallas 1986, no pet.); *see* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3 (stating that, at the punishment phase, "evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act."). However, "[e]vidence of affirmative defenses which would exonerate the defendant is not admissible at the

24

punishment phase of the trial." *Nixon v. State*, 572 S.W.2d 699, 701 (Tex. Crim. App. 1978); *Mayfield v. State*, 803 S.W.2d 859, 866 (Tex. App.—Corpus Christi–Edinburg 1991, no pet.); *see McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007) ("[A]t the punishment stage of a criminal trial, evidence is not admissible for the purpose of relitigating the defendant's guilt."). Duress is an affirmative defense to the charged offenses. *See* TEX. PENAL CODE ANN. § 8.05. The trial court did not abuse its discretion in implicitly concluding that appellant's testimony set forth above was inadmissible because it was geared towards establishing an affirmative defense to the offenses for which appellant was already found guilty. *See Nixon*, 572 S.W.2d at 701. The court could have determined that appellant's testimony was adduced for the purpose of relitigating the issue of guilt rather than to establish any fact relevant to punishment.

Further, the trial court did not make an improper comment on the weight of the evidence when ruling on the objections. The court's remarks indicated that appellant's testimony was being excluded not because of its substantive content, but rather because it addressed issues which were not relevant at the punishment phase. However they are interpreted, the court's remarks did not indicate disbelief in the substance of appellant's testimony or diminish the credibility of his defensive theory. *See* TEX. CODE CRIM. PROC. ANN. art. 38.05; *Proenza*, 541 S.W.3d at 801.

Appellant's fourth and fifth issues are overruled.

### III. MODIFICATION OF JUDGMENT

The State observes that the judgments of conviction do not reflect (1) that the jury found true an enhancement paragraph alleging that appellant had previously been convicted of a felony, or (2) the correct range of punishment for the offenses after

enhancement. *See* TEX. PENAL CODE ANN. § 12.42(b).[8] This Court has the power to modify a judgment to speak the truth when we are presented with the necessary information to do so. *See Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). Accordingly, we modify both judgments of conviction to reflect: (1) appellant pleaded "not true" to the enhancement paragraph; (2) the jury found the enhancement paragraph true; and (3) the applicable punishment range for each offense, after enhancement, was life or a term of five to ninety-nine years in prison and a fine not to exceed $10,000. *See* TEX. PENAL CODE ANN. § 12.42(b) (providing generally that, if it is shown on the trial of a second-degree felony that the defendant has previously been finally convicted of a felony other than a state jail felony, on conviction the defendant shall be punished for a first-degree felony); *see id.* § 12.32 (setting forth punishment range for first-degree felony).

## IV. CONCLUSION

The trial court's judgments are affirmed as modified herein. *See* TEX. R. APP. P. 43.2(b).

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
18th day of March, 2021.

---

[8] Instead, both judgments state: "Plea to Enhancement Paragraphs: None"; "Finding to Enhancement: None"; and "Applicable Punishment Range (including enhancements if any): 2-20 Years in Prison/Max $10,000 Fine."